IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALI  WARISUZZAMAN | * | |
| 14 NorthLine Road | | JURY TRIAL DEMANDED |
| Newtown Square, PA 19073 | | |
| warisuzzaman@gmail.com | | |
| 484-352-6741; 610-316-0162 | * | Civil Action No: |
| *Plaintiff* | | |
| *Vs*. | * | |
| AMERICAN AIRLINES GROUP, INC.. | | |
| John Doe, Christopher Doe and | * | |
| Captain Doe. | | |
| American Airlines Head Office | | |
| 1, Skyview Drive in Fort Worth | * | |
| TX 76155 | | |
| *Defendants* | | |

---

# C O M P L A I N T

Federal Civil Rights Violations, State Tort

---

01. Plaintiff, Ali Warisuzzaman, *pro se,* brings about this racial discrimination claim against American Airlines Group, Inc., for violating Plaintiff's federal civil rights under Section 1981, Title VI, Section 1985 (3), under Civil Conspiracy, Invasion of Seclusion, Defamation per se, Defamation, and Intentional Infliction of Emotional Distress.

**PARTIES**

02. Plaintiff Ali Warisuzzaman ("Plaintiff"), is a 79-year-old male who has been a U. S. Citizen for forty years. He is of Asian Indian origin, of Brown race and a resident of Southeast Pennsylvania for many decades. Plaintiff lives at 14 Northline Road, Newtown Square, PA 19073; Ph.: 484-352-6741 and 610-316-0162; warisuzzaman@gmail.com

03. Defendant American Airline Group, Inc. ("Defendant AA") is an American commercial air carrier incorporated under the laws of the State of Delaware and headquartered at 1, Skyview Drive in Fort Worth. TX 76155.

04. Defendant Flt. Attendant John Doe ("Defendant John Doe" hereinafter), an individual, is or was, a Flight Attendant, employed by Defendant American Airline and on duty aboard Flight 765 on October 3, 2025.   details on his identity will be provided after discovery of his full name and contact information.

05. Defendant Flt. Attendant Chrostopher Doe, ("Defendant Christopher Doe" hereinafter), an individual, is or was, a Flight Attendant employed by Defendant American Airlines and on duty aboard Flight 765 on October 3, 2025. Additional details on his identity will be provided after discovery of his full name and contact information.

06. Defendant Captain John Doe ("Defendant Captain Doe" hereinafter), an individual, is or was a pilot employed by Defendant American Airlines. At all times relevant to the events mentioned herein, Captain John Doe was the pilot of AA Flight 765 on October 3, 2025. Additional details on his identity will be provided after discovery of his full name and contact information.

## JURISDICTION and VENUE

07. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as Plaintiff asserts claims, herein, that arise under the laws of the United States, namely, 49 U.S.C. § 40127, prohibitions on discriminations by airlines; 42 U.S.C. § 2000d, prohibitions on discrimination by federally assisted activities; and 42 U.S.C. § 1983, Deprivation of civil rights.

08. This Court also has supplemental jurisdiction over the State law claims pursuant to 28 U.S.C § 1367 because these claims are so related to Plaintiff's federal question claims that they form part of the same controversy.

09. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of Different States and more than $75,000 is in controversy.

10. This Court has specific personal jurisdiction over Defendants because Defendants have sufficient contact with the Commonwealth of Pennsylvania, and this case arises out of Defendants' tortious acts directed to a person domiciled in Pennsylvania.

11. This Court has general personal jurisdiction over Defendants because Defendants are "are at home" in Pennsylvania. Among other things, Philadelphia International Airport is Defendant AA's fourth-largest hub where approximately 46 to 47% of its flights operate.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) (2), as Plaintiff's carriage contract with Defendant AA commenced in Philadelphia which is within this judicial district. Venue is also proper based on 28 U.S.C. § 1391(c) (1) given that Plaintiff, a natural person, resides in Delaware County, Southeast Pennsylvania.

**Perspective**

13. Since 9/11, airline crews have attained unprecedented power based on real and perceived security threats. Justifiably so.

14. Nevertheless, a survey shows that there have been several situations where

this power has been blatantly abused by the crew victimizing innocent airline passengers.

15. In most cases the brunt of airline crew's misconduct was borne by the racial minority groups, mostly with impunity, given that few passengers have the resources and determination to challenge such conduct.

16. American Airline happens to be the Poster Boy of such prejudices. In the recent past, as tip of the iceberg, for example:

17. In *Desean Ray v. American Airlines*, a passenger of the minority group, who was going to attend his father's funeral, was taking pictures of the clouds through the window of the aircraft. The air hostess told him to delete the pictures as that were not allowed by the Airline policy. Sky fell on the passenger when he said, "it was a bad policy." The hostess immediately called the captain who did an unscheduled landing at the Phoenix airport only to remove Desean Ray and blacklist him for future flights.

18. In *Alvin Jackson v. American Airlines* when one White passenger complained of body odor coming from the Negro seated in next seat, all eight Negroes, seated in different areas of the aircraft were removed from the plane.

19. In *James v. American Airline,* a White woman sitting behind Alicia James, a black woman, started banging James' seat from behind and cursing her. When James

cursed back, she was removed from her seat to a new seat. Nothing happened to the

White woman. Later, two flight attendants told her aloud that the Captain wanted to let

her know that if she did not behave, she would be removed the plane.

20. In *Cerqueira v. American Airlines*, Plaintiff, a U.S. Citizen of Portuguese

origin, was removed by American Airlines because he appeared to be Mideastern or

Asian and spoke some foreign words for which he was referred to the law enforcement

who released him only after intense interrogation.

21. Of black race, a retired Judge, Pamela Hill-Veal's experience involved an

incident of alleged racial discrimination during a first-class American Airlines flight

from Chicago to Phoenix in February 2024. A flight attendant stopped her after she

used the first-class restroom, and instructed her to use the economy class restroom

in the back of the plane or else, she'll get her arrested by PPD upon landing. So on and

so forth. There's a long list of such discriminatory patterns.

22. In fact, American Airline has a documented history of frequently subjecting

Black passengers (and other passengers of color) to differential treatment and bigotry.

This airline's egregious violations of civil rights of minority groups have been a major

concern for leadership. So much so that in 2017, the NACCP issued a travel advisory

warning Black travelers that they could be subjected to "disrespectful, and

discriminatory conditions" by this airline.

**Plaintiff's Background**

23. Plaintiff, who is 79 years old, was born and brought up in India. He has taken hundreds of international and domestic flights without any incident.

24. Plaintiff has advanced degrees in biological sciences and biomedical engineering. He has taught medical sciences at the university level. He is a father of three children and grandfather of two.

25. Plaintiff has lived in the United States for more than 50 years and has lived in Southeast Pennsylvania since 1979. Except for minor traffic violations, he has never been charged with any felony, or even misdemeanor, in his life.

<b>FACTS COMMON TO ALL COUNTS</b>

26. On October 3, 2025, Plaintiff boarded American's Flight 765 from Philadelphia International Airport to Phoenix, AZ, for the weekend, to attend his granddaughter's birthday. He was seated on seat 35C which was the last but one row on the Airbus. It was a 5-hour non-stop flight to Phoenix, AZ.

27. AA's Flight 765 was an Airbus A 321, with a total capacity of 220 seats which, in the above-mentioned flight was all filled with passengers.

28. All or most of the passengers in this Flight appeared to be Caucasians except the Plaintiff and a passenger in row 36 (last row)[1] who happened to be Asian-Indians. These two people of color stood out.

29. During the Flight, there were only three crew members and a passenger that Plaintiff interacted with. These were:

(a) Flight Attendant Joh Doe: Caucasian, about six feet tall, clean shaven (John Doe, hereinafter).

(b) Flight Attendant Christopher Doe: Caucasian of medium height with a light beard and a first name" Christopher." ("Christopher Doe" hereinafter).

(c) Flight Attendant, Jane Doe: A lady of Asian origin in her 30s or so. ("Jane Doe" hereinafter).

(d) Captain Doe: The pilot whom the Plaintiff never met and cannot describe his physical appearance until discovery is made.

---

[1] Based on a casual look, and in Plaintiff's experience, it seems to be American Airlines' unwritten policy to seat people of color in the rear most seats if possible. Plaintiff in the said flight was seated in the last but one row, in the last row was another passenger of Indian origin. On his return flight, on October 5, 2025, by Flt. AA 653, Plaintiff, once again, was given seat 36C, the last row and next to him on seat 36B was a black lady. And this row, across the aisle, were mostly occupied by black passengers. A week earlier, on September 22, 2025, when Plaintiff traveled from Boston to Philadelphia, on Flight AA 1776, he was allotted seat 31D. In Plaintiff's earlier trips, from Philadelphia to Charleston, W.V, he was almost always seated in the back rows.

30. Defendant John Doe was the first refreshment server sometime after the flight took off. He served the first 34 rows and skipped rows 35 and 36. The cabin light was dim; many passengers were asleep. However, Plaintiff was visible, fully awake and reading a book under the overhead light.

31. When Plaintiff was not served for considerable time, he asked Jane Doe as to why he was not served. Jane Doe was courteous and brought up a cup of coffee with a small pack of biscuits and, apparently, communicated Plaintiff's curiosity to John Doe as to why he was not served.

32. From this time onwards, when Defendant John Doe passed by the Plaintiff, he gave Plaintiff a dirty look.

33. Nevertheless, the entire flight was uneventful until about an hour, or so, before landing when Plaintiff went to the rear Lavatory, about two-three feet from his seat, and, as usual, locked the door from inside.

34. Moments after he sat on the toilet seat, Plaintiff heard a loud bang on the Lavatory door followed by a yelling question, "Are you smoking"?

35. "No, I don't smoke," Plaintiff said from behind the Lavatory doors. Petrified by the news of smoke, Plaintiff looked around, scanning the large mirror in the Lavatory, and did not detect any smoke.

9

36. "No, you are smoking. There's smoke coming out of the Lavatory" yelled the voice back followed by the opening of the locked Lavatory door and John Doe peeping while Plaintiff still sitting on the toilet seat. Apparently, the airline crew had the means to open locked Lavatory doors from outside in emergency situations.

37. "Come out." John Doe kept screaming.

38. "Wait a minute, there's no smoke here." Plaintiff kept assuring John Doe.

39. "Come out, come out." John Doe did not stop screaming and kept opening the door which Plaintiff, from inside, was pushing back to shut the doors to keep his privacy.

40. Then came Christoper Doe who also opened the door and shouted at the Plaintiff to come out.

41. A few seconds later, Passenger Doe opened the door while Plaintiff was still sitting on the toilet seat. He also had a short conversation with the Plaintiff about smoking until Plaintiff pushed back the door shut.

42. Passenger Doe looked like a crew member. He was also Caucasian, about 6' tall, in dark blue attire and a light beard. He was wearing a ribbon of some badge around his neck. Plaintiff had initially confused him as part of the flight crew. Both John Doe and Christopher Doe, apparently, knew Passenger Doe because they were frequently

seen together.

43. If the aircraft is equipped with audio-visual cameras, one would see that in a matter of one minute, Christopher Doe violently banged and opened Lavatory door at least five times. May be, six or seven times. John Doe and Christopher Doe kept loudly accusing Plaintiff of smoking and asking him to come out; each time peeping inside.

44. Plaintiff was unable to re-lock the door because he was sitting on the toilet seat defecating.

45. If the crew did not have the capability to re-lock the door, which they had opened from outside the Lavatory, it was their duty to put a sign outside warning other passengers that the Lavatory was occupied. However, they neither did so nor stopped other passengers who were opening the Lavatory door out of curiosity.

46. Plaintiff could not come out because he was in the middle of defecation and urination as discussed below.

**Plaintiff's Medical Condition**

47. The almost eighty-year-old Plaintiff suffers from multiple diagnoses including lung disease, heart disease and, above all, Chronic Kidney Disease ("CKD"), Stage-Four, which is one stage before dialysis.

48. Patients with advanced CKD cannot void their bladder at once; it is mostly in short intervals. Also, if the patient is impacted (has to move bowels), urination is hard to accomplish until the defecation is complete or gas is discharged.

49. When the crew was rushing Plaintiff to come out, the latter was in the middle of defecation and, though extremely scared of the possibility of fire, could not just get up and exit the Lavatory.

50. It took Plaintiff a few seconds to clean up and come out. He had to go through the painful act of sucking back both the bowel movement and urination and did so until he  got home because of the events that followed.[2]

51. When the frequent banging and opening the door became very loud and violent, Plaintiff barely cleaned himself and came out and was confronted by both John Doe and Christopher Doe. Passenger Doe was also with them waiting to use the Lavatory.

52. When Plaintiff came out of the Lavatory, terribly shaken, to his surprise, he found everything quite normal. There were no signs of an emergency that had allegedly taken place a short while ago.

_____

[2] The pain caused by holding the urine and reversing the bowel movement process, as discussed above, lasted for quite a while even after the Plaintiff had an opportunity to relieve himself. This is because in patients with damaged kidneys, holding back the urine causes pulsating pain in both kidneys even after they void.

53. In fact, Passenger John Doe, who had attempted to enter Plaintiff's toilet room, was still waiting for a vacant Lavatory. In the meantime, the Lavatory, right in front, became vacant and he went there.

54. Discovery in this case is likely to confirm that 'smoke emergency' if true, was quickly resolved after which the duo used "emergency" as a pretext to harass and humiliate the Plaintiff stemming from their racial animus.

55. John Doe and Christopher Doe did not have the decency to apologize for how they intensely coerced the Plaintiff to come out of the Lavatory for absolutely no reason except racial animus.

56. Plaintiff was upset and offered both the crew members to smell his clothes for tobacco smell. The crew did not take the offer.

57. Plaintiff then asked to speak to the Head Flight Attendant aboard the flight for an explanation as to what happened. Christopher Doe told Plaintiff, in an angry demeanor, that there was no Supervisor and that he was in charge, reporting to the captain directly.

58. Plaintiff then asked him if he could speak to the captain, which Christopher Doe ignored.

59. About 30 minutes before landing in Phoenix, when John Doe passed by,

Plaintiff told him that, upon landing, he would like to talk to the captain (Captain Doe). John Doe replied, gleefully, that upon landing Plaintiff would be dealing with the Police which is waiting for him at the airport.

60. Plaintiff was shocked to learn that for absolutely no fault of his, just based on racial animus, Defendant Christopher Doe out of malice said something to the captain which prompted the captain to call the police.

61. Of course, Captain Doe could not have come out of the cockpit to check the veracity of Defendant Christopher Doe's hate-filled allegations, but had Defendant AA trained its crew on DOT guidelines, Captain Doe would have asked Defendant Christopher Doe the right questions as required by DOT guidelines.

**Defendant AA and Pheonix Police: Hand in Glove**

62. Phoenix Sky Harbor Airport is Defendant AA's major hub. It is owned and operated by the City of Phenix. Given that Defendant AA has employed 7,400 employees at the hub which serves as a base for over 1,300 flight attendants, more than 730 pilots, and nearly 1,00 customer service staffers, its network spans over 100 destinations across three countries, and during peak periods, daily departures can exceed 260.

63. These numbers give Defendant AA considerable muscle-flexing in the City of Phoenix. So much so that Defendant AA is considered Phoenix's hometown airline.

64. It is no wonder, therefore, that Defendant AA considers, and treats, the Phoenix Police Department ("PPD") as its personal security force.

65. PPD comes in handy when Defendant AA's racist crew wants to intimidate a person of color without probable cause or reasonable suspicion. And PPD's Departmental policies generously oblige Defendant AA in such unlawful harassment and intimidation.

66. Anyway, upon landing, as Plaintiff walked out of the aircraft into the Airport lounge, he found himself surrounded by at least 7 to 10 heavily armed policemen from PPD who had made a large circle around the Plaintiff. It was quite a scene. Scenes that you see on TV in mass shootings or terroristic attacks. This happened to the Plaintiff who, in his long life, was never charged with a crime.

67. Passengers had gathered out of the cordoned off circle to watch what was going on. Some of them were taking pictures or making videos. The crowd mostly consisted of the passengers, aboard the plane, who had heard the crew accusing the Plaintiff for smoking in the Lavatory.

68. Plaintiff was in the center of the police circle where the head of the Police team, Officer E. Gustafson, equipped with bodycam, came over and started publicly interrogating the Plaintiff.

69. Officer Gustafson's bodycam video would show the surrounding crowd and that Plaintiff was urging the Officer to take him to the police station for blood and urine nicotine test along with a polygraph to determine exactly what happened.

70. Officer Gustafson interrogated Plaintiff for a while and then told him that he was free to leave because there was no charge against him.

71. The complaint of Defendant AA's Captain Doe was so frivolous that the PPD is now blocking access to the incident report and copy of bodycam to escape accountability and help Defendant AA which has substantial influence on PPD.

.     72. Defendant AA's liability, in this episode, in part, stems from the fact that it failed to train its crew on the U.S. Department of Transportation ("DOT") guideline designed for the airlines crew, including the captain, on when to call the law enforcement, especially, in the case of passengers from the minority groups.

*See* **Exhibit-"A"**

73. The horrible in-flight and disembarking episode came to an end after Plaintiff left the airport and drove off with his family who had been very anxiously waiting for him at Phoenix airport. Plaintiff had called them from the aircraft about the police.

74. The entire Birthday event, which Plaintiff and family members from far off places had come to attend, was totally ruined by the flight and the airport incident.

75. Again, had Defendant AA trained its crew on U.S. DOT's guideline, sensitized them enough on diversity and rights of minorities, this case would not have existed

**CAUSES OF ACTION**

**COUNT I**
**42 USC § 1981**

76. Plaintiff repeats the allegations in Paragraphs 1 to preceding Paragraph as though stated here in full.

77. Plaintiff is an Indian American, is of Brown race, and 79 years of age.

78. At all material times, and pursuant to 42 U, S.C.§1981, Plaintiff was, and is, entitled to the full and equal benefit of all laws and proceedings for the security of person and property as enjoyed by white citizens.

79. There was a valid Carriage Contract between Plaintiff and Defendant AA, in which Defendant AA had assured the Plaintiff that:

(a) "At American Airlines, our mission is to provide safe, reliable and friendly air travel, supported by a broad range of products and services. We are committed to making each flight an enjoyable experience, prioritizing your safety, comfort and convenience." (Para 1, of the Contract); and

(b) "Our goal is to be a service and product leader in the airline industry. When customer service issues arise; we try to resolve them at the first point of contact. As a result, we have devoted resources to the front line and rely on our personnel to solve most issues throughout the travel journey." (Para 5 of the contract).

80. In the above-mentioned Contract, Plaintiff, on his part, had done each and everything required of him.

81. However, in violation of Covenant (a) of the Contract, Defendant AA through its crew based on Plaintiff's race and ethnicity, unilaterally, and intentionally impaired the contract, by (a) intruding upon his seclusion when he was in the Lavatory, (b) by falsely accusing him of a federal crime of smoking in the Lavatory, (c) defaming him, (d) conspiring to deprive him of his federally protected right to travel and conspiring him to be detained at the airport without probable cause, reasonable suspicion or any justification whatsoever.  Thus the Defendants humiliated, and degraded the Plaintiff and robbed him of dignity during the flight and upon landing.

82. When Plaintiff asked to speak with the captain (about the misconduct of the Crew) Defendant AA's racist crew, in violation of Covenant (b) of the Contract and in violation of the U.S. Department of Transportation Guidelines **(Exhibit "A"),** Defendant AA crew conspired and combined with PPD with which they have a long standing relationship.

83. Thus, because of his race Plaintiff was deprived of a legally protected right to make and enforce contracts and to travel interstate free of discrimination, including the benefits, privileges, terms and conditions of a contractual relationship enjoyed by White citizens of the United States, in violation of 42 USC Section 1981.

84. Defendants intended to discriminate against Plaintiff on the basis of his race

and they did intentionally discriminate against him.

85. Violation of Plaintiff's rights occurred during the enforcement of the Contract, i.e., aboard the Flight.

86. The said violation of Plaintiff rights would not have occurred but for his race.

87. Thus, Plaintiff suffered an adverse action in which Plaintiff's race was but-for cause of discrimination as opposed to similarly situated White passengers aboard the Flight.

88. Defendant crew members were acting in the scope of their duties. They acted with reckless disregard for Plaintiff's federally protected rights.

89. Defendant AA is liable for the unlawful acts of its employees directly and/or under the doctrine of *respondeat superior*.

90. As a direct and proximate result of said wrongful acts by Defendants, Plaintiff suffered, and will continue to suffer humiliation, anxiety to fly, shame, despair, anguish depression, embarrassment, mental pain, injury to his reputation and economic losses.

## COUNT II

### Title VI of Civil Rights Act of 1964 (42 USC § 2000d)

91. Plaintiff repeats the allegations from Paragraphs 1 to the preceding Paragraph as though stated here in full.

92. Defendant AA is the recipient of federal financial assistance,

93. On October 3, 2025, Plaintiff was aboard Flight 765, owned and operated by Defendant AA; the beneficiary of federal funding for its operations.

94. In the said Flight, Defendant AA denied Plaintiff the benefit of the federal funding and excluded him from enjoying the travel by discriminating against him on the basis of race, color and/or national origin.

95. Defendant AA's actions violated Title VI of the Civil Rights Act of 1964, 42 USC Section 2000d.

96. As a direct and proximate result of said wrongful acts by Defendants, Plaintiff sustained injuries and damages as described herein.

## COUNT III

### Conspiracy Against Right to Travel Interstate
### (42 USC § 1985 (3))

97. Plaintiff repeats the allegations in Paragraphs 1 to the preceding Paragraph as though stated here in full.

98. On October 3, 2025, while Plaintiff was flying from Pennsylvania to Arizona, through the *interstate airways*, Defendant AA's crew, John Doe, Christopher Doe, and Captain Doe, within the scope of their employment with Defendant AA, willfully and maliciously conspired and combined with Phoenix Police Department ("PPD"), planned to agree to cause injury to Plaintiff by publicly humiliating and

PPD, successfully deprived the Plaintiff of his right to (a) move freely and (b) to be

treated as a "welcome visitor" in Phoenix, AZ.

104. Defendants deliberately engaged in intentional discrimination based on

race, color, and/or national origin of the Plaintiff.

105. At all times relevant hereto, there was a corrupt agreement between

Defendants Christopher Doe, Captain Doe and the PPD to deny the Plaintiff equal

protection of laws and / or the equal privileges and immunities under the laws.

106. As an intentional, direct and proximate result of said wrongful acts by

Defendants and Phoenix Police, in violation of 42 USC § 1985(3), Plaintiff sustained

injuries, and will continue to suffer humiliation, anxiety to fly, shame, despair,

embarrassment, depression, mental pain, anguish, injury to his reputation and economic

losses due to the deprivation of his right to travel interstate causing damage to Plaintiff's

person.

**COUNT IV**

**CIVIL CONSPIRACY**

107. Plaintiff repeats the allegations in Paragraph 1 to the preceding Paragraph

as though stated here in full.

108. On October 3, 2025, from Plaintiff was travelling from Philadelphia, PA, to

Phoenix, AZ, via AA Flight 765.

109. Defendants Christopher Doe and Captain Doe ("the Pair") were part of the Defendant AA's crew aboard the said flight.

110. The Pair loaded with malice, against Plaintiff's race, conceived a plan to humiliate and intimidate the Plaintiff upon arrival at Phoenix.

111. The Pair conspired and combined with PPD to detain and publicly interrogate Plaintiff upon arrival at the Phoenix airport without probable cause, reasonable suspicion or any justification.

112. Thus, upon arrival at the Phoenix airport, Plaintiff found himself surrounded by seven to ten heavily armed policemen who detained the Plaintiff and publicly interrogated him while the crowd was taking pictures and making videos.

113. After the Pair's goal of humiliating and intimidating the Plaintiff was achieved, the latter was allowed to go without any charge.

114. On information and belief, and discovery in this action is likely to confirm that Defendant AA's crew has conspired and combined with PPD in other incidents also in which members of racial minority were intimidated without probable cause, reasonable suspicion or any justification at all.

115. As a direct and proximate result of said wrongful acts by Defendants and PPD, Plaintiff suffered, and will continue to suffer humiliation, anxiety to fly, shame,

despair, embarrassment, depression, mental pain, anguish, injury to his reputation and economic losses due to the deprivation of his right to travel interstate causing damage to Plaintiff's person.

## COUNT V

### Intrusion upon Seclusion
### Restatement (Second) § 652B of Torts

116. Plaintiff repeats the allegations in Paragraph 1 to the preceding Paragraph as though stated here in full.

117. On October 3, 2025, aboard AA Flight 765, when Plaintiff entered the aircraft's Lavatory and locked the door from inside, he had reasonable expectation of privacy seclusion, and solitude, before he lowered down his pants and sat on the toilet seat.

118. About three minutes later, when Plaintiff was moving his bowels, Defendant John Doe, who had been giving Plaintiff ugly looks earlier, started banging on the door, of the Lavatory, opened the door by *unlocking* it from outside and was physically peeing inside.

119. About 20 seconds later, Defendant Christopher Doe repeated the same act; opening the door and physically peeping inside staring Plaintiff's private parts, while he was on the toilet seat.

120. Later, both Defendants John Doe and Christopher Doe made it possible for other passengers keep opening the Lavatory door and peep inside. They were having fun.

121. Acting in concert, Defendants John Doe and Christopher Doe were acting intentionally, maliciously and mischievously to humiliate and degrade Plaintiff.

122. At no time the Defendants had Plaintiff's permission to open the Lavatory doors and invade Plaintiff's privacy.

123. At no time did the Defendants have any privilege to open the Lavatory doors and invade Plaintiff's privacy.

124. Defendants' conduct would be highly offensive to a reasonable person.

125. Defendants' intrusion was intentional which they repeated a few times. Defendants AA, John Doe, and Christopher Doe, through their blatant misconduct. as alleged in the foregoing paragraphs, caused extreme mental anguish, pain and suffering by publicly harassing, humiliating, degrading and defaming Plaintiff.

126. As a direct and proximate result of said wrongful acts by Defendants, Plaintiff suffered, and will continue to suffer mental anguish, humiliation, anxiety, shame, despair, embarrassment, depression, mental pain, injury to his reputation and economic losses due to the deprivation of his right causing damages to Plaintiff.

## COUNT VI

## Defamation per se (Pennsylvania case law)

127. Plaintiff repeats the allegations in Paragraph 1 to the preceding Paragraph as though stated here in full.

128. On October 3, 2025, Defendants John Doe and Christopher Doe, aboard AA Flight 765, came to the rear Lavatory of the aircraft, which was occupied by the Plaintiff, and after banging the door Defendant John Doe screamed, "Are you smoking"?

129. Upon Plaintiff's denial that he was not smoking, Defendant John Doe, in a loud voice, screamed again:

"No, you are smoking," "there's smoke is coming out." .

130. Defendant John Doe's accusation of Plaintiff, of a federal crime, that he was smoking, was likely heard by most of the 120 passengers seated in the cabin class of the American Airlines Airbus who came to understand that smoking in the Lavatory of an airplanes were a federal crime since it was announced in airplane before take-off.

131. About a minute later, when Plaintiff emerged from the Lavatory, most of the front seat passengers were looking back and attributing the 'smoking accusation' to the Plaintiff because he alone was in the Lavatory.

132. Thus, Defendant John Doe made a false statement accusing Plaintiff of a federal crime that was published and received possibly by many of 120 people who

attributed the comment to the plaintiff.

133. Plaintiff's esteem in the minds of the passengers, who heard Defendants' comments, was extremely diminished and will remain diminished because Plaintiff did not have an opportunity to go through a due process to exonerate himself.

134. The publication of false statements by Defendant John Doe makes Defendant AA, and John Doe liable to Plaintiff under the laws of Pennsylvania.

135. As a direct and proximate result of said wrongful acts by Defendants, Plaintiff sustained injuries and suffered damages.

**COUNT VII**

**Defamation**

**(Pennsylvania case law)**

136. Plaintiff repeats the allegations in Paragraph 1 to the preceding Paragraph as though stated here in full.

137. On October 3, 2025, during AA Flight 765, Defendants Christopher Doe and Captain Doe caused Plaintiff to be detained and publicly interrogated by Phoenix Police.

138. Plaintiff was detained by the Phoenix Police on Defendants Christopher Doe and Captain Doe's orders and directions.

139. In detaining the Plaintiff, the Phoenix Police were acting pursuant to the statements published by the said Defendants.

140. In order to procure Plaintiff's detainment and public interrogation,

Defendants published *unprivileged* and false statements of fact to the Phoenix Police.

141. Upon information and belief Defendants falsely stated to the Phoenix Police that Plaintiff was a security risk or concern during AA Flight 765, on October 3, 2025.

142. This statement constitutes imputation of the commission of crime. Plaintiff was never a security risk or concern during AA Flight 765, on October 3, 2025.

143. Upon information and belief Defendants falsely stated to the Phoenix Police that Plaintiff was "loud" towards Defendant Christopher Doe during AA Flight 765, on October 3, 2025.  In their zeal to call the police, Defendants had ignored the U. S. Department of Transportation's guideline (Exhibit A).

144. This statement constitutes imputation of a crime.

145. The said falsity was augmented when a contingent of Phoenix Police surrounded the Plaintiff, upon his disembarkation from the aircraft, and interrogated the Plaintiff at Phoenix airport in front of a curious large crowd.

146. Defendants report was so frivolous that the Phoenix police that Phoenix Police is now aggressively blocking Plaintiff from accessing it notwithstanding the Police reports are public information. .

147. However, the Defendants caused considerable damage to Plaintiff's reputation given the crowd took pictures and made videos.

148. Defendants and PPD are jointly and severally liable for this unprivileged publication.

149. As a direct and proximate result of said wrongful acts by Defendants, Plaintiff suffered, and will continue to suffer humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to his reputation and economic losses due to the deprivation of his right to privacy causing damages to Plaintiff in an amount to be proven at the time of trial.

## COUNT VIII
### Intentional Infliction of Emotional Distress

150. Plaintiff repeats the allegations in Paragraph 1 to the preceding Paragraph as though stated here in full.

151. By reason of applicable statutes and regulations, Defendants were in a position of authority over Plaintiff.

152. Defendants used their position of authority to further their intentional and outrageous conduct to abuse and mistreat Plaintiff when they:

(a) treated him in a rude and racially charged manner,

(b) impaired carriage contract,

(c) harassed him, one after the other, intruding upon his seclusion while he was in Lavatory, and enabled other passengers to do the same,

29

(d) conspired and combined with City of Phoenix law enforcement to humiliate and intimidate Plaintiff without probable cause, reasonable suspicion or any justification to deprive him of his Right to Travel given to him by the U.S. Constitution,

(e) defamed him and

(f) defamed him per se by loudly accusing him of a federal crime.

153. Defendants' position of authority over Plaintiff enhances outrageousness of their conduct.

154. Defendants overall conduct described under this Count, motivated by racism was so extreme and outrageous and extreme as to go beyond all possible bounds of decency.

155. Defendants misconduct inflicted intentional and extreme emotional distress on the Plaintiff without any justification or privilege.

156. The said emotional stress with associated depression, anger, anxiety, betrayal and insomnia has compelled him to seek psychiatric help.

157. As a direct and proximate result of Intentional Infliction of Emotional Distress by Defendants, Plaintiff suffered, and will continue to suffer humiliation, anxiety to fly, shame, despair, embarrassment, depression, mental pain, anguish, injury to his reputation and economic losses due to the deprivation of his right to privacy causing damages to Plaintiff in an amount to be proven at the time of trial.

**WHEREFORE,** based on COUNT I through COUNT VIII, Plaintiff requests this Honorable Court to grant Plaintiff the following relief against Defendants:

a. Declaratory judgement finding that the actions of Defendants alleged in this Complaint violated 42 USC Sections 1981, Tile VI and 1985 (3) and the State laws.

b. Permanent injunction enjoining Defendants from continuing to engage in the civil rights violations, discrimination and other unlawful conduct alleged herein.

c. General damages in an amount to be determined at trial, but in no event less than one million dollars ($1,000,000).

d. Special damages in an amount to be determined at trial.

e. Punitive damages, where applicable.

f. Costs and attorneys' fees that incurred in this matter.

g. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Ali Warisuzzaman, Plaintiff *pro se*
14 NorthLine Road,
Newtown Square, PA 19073
warisuzzaman@gmail.com                              Newtown Square, PA
(484)-352-6741; (610) 316-0162                      Dated: November 10, 2025.

31

Exhibit "A"

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE GENERAL COUNSEL**
**OFFICE OF AVIATION ENFORCEMENT AND PROCEEDINGS**
**WASHINGTON, DC**

---

## Guidance for Airline Personnel on Non-discrimination in Air Travel

This guidance is intended to assist airline employees and contractors ("airline personnel") understand their legal obligation under 49 U.S.C. § 40127(a), and other Federal anti-discrimination statutes,[1] not to discriminate on the basis of race, color, national origin, religion, sex or ancestry in air travel. The Department of Transportation ("Department") recognizes the very important and difficult job of the airlines to provide a safe and secure travel environment. At the same time, it is important that this function be carried out in a non-discriminatory manner.

This guidance supersedes prior guidance that the Department has issued in the area of non-discrimination in air travel. It is intended to address particular situations where passengers may be denied boarding or removed from aircraft before take-off. The Department recognizes that once the aircraft is airborne, decisions based on safety and security considerations may have to be made very quickly and with limited information.

The guidance provides practical and useful decision-making techniques for airline employees and contractors to use when distinguishing between situations where a legitimate safety or security concern exists and situations in which concerns are based on assumptions and stereotypes related to a passenger's race, color, national origin, religion, sex, or ancestry. This guidance also demonstrates the application of these techniques and tools to promote appropriate non-discriminatory responses to possible safety or security concerns through illustrative scenarios.

It is our understanding that most airlines already have training on non-discrimination against passengers in air travel. The Department encourages all airlines to implement comprehensive anti-bias training to help prevent and reduce incidents of unlawful discrimination. We also encourage airlines to incorporate this guidance into their training programs as an additional tool. Last, this guidance is not prescriptive, and there may be alternative measures, techniques, or procedures that can be effective for preventing unlawful discrimination against air travelers.

This guidance document pertains solely to the activities and authorities under the purview of the U.S. Department of Transportation and does not address aviation security requirements or procedures under the jurisdiction of the Transportation Security Administration, U. S. Department of Homeland Security.

---

[1] The Department has also interpreted 49 U.S.C. §§ 41310(a), 41712, and 41702 as prohibiting discrimination against air travelers.

**Airline Personnel Decision-Making Process**

To ensure compliance with the law, airline personnel should:

1. **Be Comprehensive:** Before taking any action, airline personnel should conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. A comprehensive evaluation should include whether a passenger's appearance is the determinative factor causing concern. In other words, airline personnel should ask themselves - but for the passenger's perceived race, color, national origin, religion, sex, or ancestry, would I be concerned that his or her behavior rises to the level of a potential threat to security or safety?

2. **Ensure Effective Communication:** Communicate by actively participating in information exchange with the passenger, co-workers, and other air travelers (if appropriate and applicable) to clarify and confirm the facts and details involved in the situation.

3. **Follow Airline Protocol and Decision-Making Process:** In conducting an inquiry, airline personnel should follow their company's protocol and decision-making processes, and relevant government agencies' directives, to resolve the situation appropriately.

4. **Assess Each Situation Individually:** Focus on the specific facts and details to ensure that any basis for taking action based on perceived suspicious behavior is reasonable. A passenger's perceived race, color, national origin, religion, sex or ancestry alone is not a reasonable basis. All passengers have the right to fly free from all forms of unlawful discrimination.

5. **Inquire about the Potential Threat:** Ask yourself if you appropriately carried out the airline's obligation to inquire. For example:
   - Did you speak to the passenger;
   - Have you consulted your co-workers about your concern;
   - Did you follow company policy and utilize your training; and
   - Have you intentionally or inadvertently considered any stereotypes in your inquiry?

6. **Resolve and Remedy the Situation:** Airlines should include conflict resolution techniques in their procedures and protocols, *e.g.*, active listening, self-awareness, validating frustrations, anti-bias and anti-discrimination techniques, and honest communication. Airline personnel should employ the suggested techniques and attempt to resolve the situation by taking the appropriate action in compliance with the law and established airline policy. Explain your decision to persons involved, including co-workers and, when appropriate, to passengers.

Taken together, these principles are summarized by the acronym, **BE FAIR**:
>**B**e Comprehensive
>**E**nsure Effective Communication
>**F**ollow Airline Protocol and Decision Making Process
>**A**ssess each situation individually, considering cultural awareness factors
>**I**nquire about the potential threat
>**R**esolve and remedy the situation.

2

**Illustrative Scenarios**

The Department understands that complex scenarios may arise quickly and require airline personnel to respond promptly, sometimes under tight timeframes and stressful conditions. These situations may require additional questioning, screening, searches, or requests for support from appropriate authorities for safety or security reasons. We have provided the following examples to illustrate possible ways to resolve a situation effectively while respecting all passengers' rights.

**Scenario 1:** Two men are seated together onboard the aircraft before take-off, and are whispering in a foreign language. One of the men is also holding a book that appears to be written in Arabic. A third passenger seated nearby overhears their conversation and informs airline personnel that he feels "uncomfortable" with the two individuals. The third passenger believes they are of Arab or South Asian descent, that they are speaking in a foreign language, which he thinks is Arabic, and holding a book in a foreign language, which he thinks may be the Quran. The third passenger notifies the flight attendant.

**Action:** Airline personnel have an obligation to conduct an objective and comprehensive inquiry considering the totality of the circumstances before taking action. Crew members should follow airline protocol for these situations and rely on their training to accomplish an objective inquiry. The pilot, who has ultimate authority for the safety of the flight, may rely on the cabin crew to make an accurate fact-based assessment of the situation. A decision is proper if based on an analysis of the facts known at the time before acting.

Before taking action, you should consider whether these passengers' behavior would concern you but for their appearance, *i.e.*, would you be concerned if they did not appear to be of Arab descent, speak in a foreign language, or hold a book written in Arabic that appears to be the Quran? You should ask yourself: "If I had observed this exact behavior in non-Arab men speaking English, would you still be concerned?" If the answer is no, and if there is no other information possibly indicating a potential threat to security or safety, you may be discriminating against the passengers on the basis of their religion or national origin if you remove them from the airplane.

Your inquiry might also include observing the passengers in question and, if necessary, speaking directly with them. You should also consider conferring with your colleagues and be sure to relay your factual observations rather than just feelings, beliefs or opinions. It is important to ensure that your inquiry is not based on cultural stereotypes and is focused on first-hand observable behaviors that support a reasonable and rational evaluation of the facts leading to the security concerns. In this scenario, it is not permissible to remove the passengers on the basis that they are speaking Arabic, they appear to be of South Asian descent, and are holding a book written in Arabic or another foreign language. It is also impermissible to remove the passenger simply because he is holding a book that appears to be the Quran.

If, while conducting an objective fact-based inquiry considering the BE FAIR analysis, you become aware of additional facts or information indicating that the passengers may pose a safety or security risk to the flight, you should appropriate action in compliance with the law and established airline policy. If that results in removal of a passenger, it is important that the removal be

3

conducted respectfully and as discreetly as possible. Alternatively, if you conclude that the passengers in question do not pose a security risk, consider offering to move the third passenger to another seat or offering to rebook him on another flight, if that passenger remains uncomfortable with the other passengers' presence.

**Scenario 2**: A bearded male passenger with a tan complexion boards the aircraft. Prior to take off, the passenger goes to the aircraft lavatory and remains for an extended period of time. Upon returning to his seat, the passenger begins making hand gestures and whispering under his breath. A flight attendant, perceiving the passenger to be nervous, becomes concerned with his behavior and advises the pilot in command of his observations. The pilot then asks that the passenger be removed from the aircraft for questioning. The passenger is not provided any explanation for his removal, except that a flight attendant says he was acting suspiciously and nervously. The airline rebooks the passenger on another flight without first contacting authorities to determine if additional security screening is appropriate.

**Action:** In Scenario 2, there are two distinct issues to consider. First, was the passenger removed for discriminatory reasons, and second, should the airline have contacted appropriate authorities to determine if additional screening of the passenger after being removed was appropriate?

Airline personnel should first conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. In this comprehensive analysis, airline personnel should ask themselves - but for the passenger's appearance, would we be concerned that his behavior may indicate a possible threat to security or safety? If you had observed this exact behavior in an individual who did not have physical characteristics similar to this passenger, would you still be concerned? If the answer is no, then taking action with respect to the passenger without first attempting to learn more information would likely be considered unlawful discrimination based on the passenger's religion or national origin.

In this scenario, a tactful conversation with the passenger, in question, may provide a reasonable explanation. You should speak directly with the passenger in question to make your own fact-based assessment of his behavior. For example, you may wish to inquire as to the passenger's health to make sure that he was not ill or required any assistance. Alternatively, the passenger may have been preparing for prayer as some religious communities do. His hand gestures and whispering under his breath after he returned to his seat may also be consistent with prayer. The simple task of active listening and communication may lead to a resolution of the situation in a non-confrontational and respectful manner.

If, while conducting an objective fact-based inquiry considering the BE FAIR analysis, you become aware of additional facts or information indicating that the passenger may pose a security or safety risk, take appropriate action in compliance with the law and established airline policy. Appropriate action may include removing the passenger from the aircraft to further investigate the potential security concern. If removal of the passenger is deemed necessary, it should be done in a respectful and discreet manner. For example, airline personnel may approach the passenger to request that he step onto the jet way to discuss the matter instead of questioning him in his seat, within earshot of other passengers. Removal by law enforcement generally should be reserved for

4

situations where the passenger will not comply with instructions or is disruptive. Flight attendants should try to use neutral language, so as not to raise concern among other passengers.

If the passenger is removed from the flight, airline personnel generally should contact the appropriate authorities and request that they follow their relevant security procedures, which may include additional screening of the passenger. A failure to contact the appropriate authorities in connection with removing a passenger from a flight may suggest that the decision to remove the passenger from the flight was motivated by unlawful discrimination rather than reasonable concern for the safety and security of the flight.

**Scenario 3:**  A Sikh man wearing a traditional turban is removed from a commercial airline . His removal was prompted by specific facts and circumstances unrelated to his appearance, perceived race, national origin, religion or ancestry/ethnicity. The passenger is then subjected to additional screening and cleared to fly by the appropriate authorities. However, the pilot refuses to allow the passenger to re-board even though there is time to do so. The passenger is then rebooked on another flight.

**Action:**  At the outset, airline personnel should focus on a comprehensive evaluation of the situation based on the totality of the circumstances. Here, the passenger has completed additional security screening and has been cleared to fly by the appropriate authorities. As such, the carrier should allow that individual to re-board the same aircraft so long as the aircraft has not yet departed and there is no other legitimate reason for refusing to carry the passenger. If a pilot continues to refuse to allow the passenger on board after he has been cleared to fly by the appropriate authorities, the Department would likely consider the pilot's decision to be unlawful discrimination and an unfair practice absent additional facts and information.

**Scenario 4:**  A woman wearing a headscarf boards the aircraft with her two children. She is one of the last passengers to board and finds that she and her children are seated separately. The passenger begins to negotiate her seating arrangement with other passengers so that she may sit with her children. The flight is running late and the flight attendant advises her repeatedly to take her assigned seat without attempting to resolve the seating situation. The woman becomes upset, refuses to sit down despite repeated requests, and insists on sitting with her children. The pilot is informed about the problem, and he advised the flight attendant to have the passenger removed from the flight.

**Action:**  Airline personnel should consider the totality of the circumstances. In other words, ask yourself - but for the passenger's appearance, would I be concerned that her behavior may indicate a safety or security threat? If you had observed this exact behavior in an individual who did not wear a head scarf, would you still be concerned? If the answer is no, taking action with respect to the passenger without first attempting to learn more information would likely be considered unlawful discrimination against the passenger based on her religion or national origin.

Communicate with the passenger and attempt to understand the passenger's concerns. Time permitting, employ creative techniques that may help resolve the problem in a less confrontational manner (*e.g.*, incentivize passengers to change their seats with vouchers or miles) as allowed under airline policy. In this scenario, the passenger and her children are the last to board and the flight is

running late, which may reduce the amount of time that a flight attendant may spend to resolve the matter.

If, while conducting an objective fact-based investigation using the BE FAIR analysis, you determine that the passenger's failure to comply with repeated instructions from the flight crew may pose a safety or security risk, take appropriate action in compliance with the law and established airline policy. A passenger's failure to comply with airline personnel instructions is grounds for denial of boarding or removal from a flight.[2] We recommend clearly explaining the pilot's decision to the passenger and ensuring that the passenger is treated with dignity and respect.

**Summary:** A passenger's race, color, national origin, religion, sex, or ancestry may not be the determinative factor in finding that a passenger may present a security or safety risk. Airlines should instead undertake a comprehensive analysis considering the totality of the circumstances. Airline personnel should take steps to conduct an objective, fact-based inquiry to ensure that a decision is reasonable and rational and follows company policy. If you conclude, after a fact-based inquiry, that a passenger may pose a safety or security threat and should be removed from a flight, it is important that the removal be conducted respectfully and with discretion. Always consider whether any situation may be resolved in a non-confrontational manner to avoid escalation. At all times, airline personnel should comply with the law and the airline's applicable policies and protocols.

---

[2] *See* 14 C.F.R. §§ 91.3(a), 121.533(e), and 121.580.